The STATE OF OHIO, Appellee,

v.

KING, Appellant.

[Cite as *State v. King*, 179 Ohio App.3d 1, 2008-Ohio-5363.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 07–CA–116.

Decided Oct. 10, 2008.

2

4

Stephen A. Schumaker, Clark County Prosecuting Attorney, and Amy M. Smith, Assistant Prosecuting Attorney, for appellee.

Flanagan, Lieberman, Hoffman & Swaim and Brett E. Rambo, for appellant.

FAIN, Judge.

{¶ 1} Defendant-appellant, Terrance King, appeals from his conviction for felonious assault and child endangering. King contends that his conviction is not supported by sufficient evidence. He further contends that he was denied the

effective assistance of counsel. Finally, King claims that the trial court erred by failing to sustain his motion to suppress evidence.

{¶ 2} We conclude that the record contains evidence sufficient to convince the average mind of the defendant's guilt beyond a reasonable doubt. We further conclude that King's claim of ineffective assistance of counsel is not supported by the record. Finally, we conclude that the trial court did not err in denying King's motion to suppress evidence. Accordingly, the judgment of the trial court is affirmed.

I

{¶ 3} Destiny Shepherd, the victim in this case, was born on April 22, 2005. On September 1, 2006, Destiny was residing with her mother, Randi Shepherd, and Shepherd's boyfriend, Terrance King. On that date, Shepherd left her apartment to go to the grocery up the street. Destiny was left in the care of King.

{¶ 4} During the time Shepherd was gone, emergency medical technicians ("EMTs") with the New Carlisle Fire Department were dispatched to Shepherd's apartment following a 9–1–1 call made by King. In the 9–1–1 call, King claimed that Destiny was having difficulty breathing. When the EMTs arrived at the apartment, they discovered the child lying on the couch with King sitting beside her. Upon examination, Destiny appeared limp and pale, with a red spot on the side of her neck and redness around her eyes. King told the emergency crew that Destiny had suffered prior episodes of breathing difficulty. At some point, Randi Shepherd returned home. According to the EMTs, Randi became distraught upon learning that her child was injured.

{¶ 5} Destiny was transported to Children's Medical Center in Dayton where she was examined by Susan Henry, M.D. Destiny was unresponsive and her legs, arms, and back were stiff. Henry discovered "small bruises" around Destiny's neck. A CT scan was performed, which showed swelling of the entire brain and a small area of bleeding in the brain, as well as a skull fracture. As a result of her injuries, Destiny suffers from epilepsy, cortical blindness, and severe developmental delay.

{¶ 6} An investigation was started regarding the source of Destiny's injuries. During the course of the investigation, King was interviewed three times. The first interview took place on September 2, after King contacted the police. King executed a written statement to the police in which he stated that prior to the incident, Destiny had been asleep in her bed and "had woke up." King further stated that he "went to her room to lay her down again, and she had got sick." The statement further indicated that when King tried to return Destiny to her

bed, she began to gasp for air, prompting him to call 9–1–1. King denied shaking or harming Destiny.

{¶ 7} Thereafter, on September 18, King underwent a polygraph test and contemporaneous interview at the Bureau of Criminal Identification and Investigation. The third interview took place at the Clark County Sheriff's Department on September 27. King was subsequently indicted on one count of felonious assault, one count of second-degree child endangering, and one count of third-degree child endangering.

{¶ 8} King entered a plea of not guilty and filed a motion to suppress statements made during the second interview, following the polygraph examination. The motion was based upon the claim that any statements made following the polygraph test were the product of coercion and upon the claim that he was not properly apprised of his right to remain silent. Specifically, during the polygraph and interview, King denied harming Destiny and denied shaking her or hitting her head. He stated that he went to Destiny's room to put her into bed but that she did not want to lie down and continued to play with her toys. He also stated that Shepherd did not harm the child. However, later in the interview, King changed his statement and indicated that when he went into Destiny's bedroom, he found her on the bed not breathing. He stated that he shook the child to rouse her. He further denied hitting the child's head but did state that "the only thing that could have happened" to her head would have been if he accidentally hit her head on "something" as he ran out of the room with the child in his arms.

{¶ 9} After a hearing on the suppression motion, the trial court found that King had not been in custody at the time of the interview and that King had voluntarily submitted to the polygraph and contemporaneous interrogation, and denied the motion to suppress.

{¶ 10} Following a jury trial, King was convicted on all counts. He was sentenced to eight years in prison. From his conviction and sentence, King appeals.

## II

{¶ 11} King's first assignment of error states as follows:

{¶ 12} "The trial court erred in overruling Mr. King's motion to suppress."

{¶ 13} King contends that the trial court should have suppressed all statements made during the second interview. In support, he claims that after the polygraph test was concluded, he was subjected to a custodial interrogation without being properly informed of his rights under the authority of *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶ 14} The state is prohibited from using any statements made by a defendant during a custodial interrogation unless proper *Miranda* warnings have been given. See *State v. Mason* (1998), 82 Ohio St.3d 144, 153, 694 N.E.2d 932 ("[o]nly a custodial interrogation triggers the need for a *Miranda* rights warning"). Thus, the threshold issue is whether King was in custody at all, especially since no formal arrest had yet occurred. "In judging whether an individual has been placed into custody the test is whether, under the totality of the circumstances, a 'reasonable person would have believed that he was not free to leave.'" *State v. Gumm* (1995), 73 Ohio St.3d 413, 429, 653 N.E.2d 253.

{¶ 15} The second issue is whether statements made by King were made with a voluntary, knowing, and intelligent waiver of his Fifth Amendment right against self-incrimination. "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Wood*, Greene App. No. 2006 CA 1, 2007-Ohio-1027, 2007 WL 706807.

{¶ 16} In reviewing a trial court's ruling on a motion to suppress, the reviewing court must keep in mind that weighing the evidence and determining the credibility of witnesses are functions for the trier of fact. *State v. DePew* (1988), 38 Ohio St.3d 275, 277, 528 N.E.2d 542. A reviewing court is bound to accept those findings of fact if supported by competent, credible evidence. See *State v. Curry* (1994), 95 Ohio App.3d 93, 96, 641 N.E.2d 1172. The reviewing court, however, must decide de novo whether, as a matter of law, the facts meet the appropriate legal standard. Id.

{¶ 17} We have reviewed the transcript of the suppression hearing.[1] From our review of the record, we agree with the trial court's finding that at the time of the polygraph and interview, King had not been charged with a crime and had not been arrested. Further, we conclude that the evidence supports the trial court's finding that King voluntarily submitted to the examination and interview. He was also made aware that he was free to discontinue the exam and interview at any point, and that he was also free to leave. Thus, we conclude that the evidence supports the finding that King was not in custody at the time of the polygraph examination and the interview.

---

1. We note that the videotape of the actual polygraph examination and interview are not part of the record before us. However, it is clear from the record that the trial court reviewed the entire videotape.

{¶ 18} We further conclude that even had he been in custody, King was adequately informed of his rights. Prior to the beginning of the testing, King signed a form that informed him of his right to remain silent, to consult an attorney, to have an attorney appointed, and to stop answering questions "at any time." King also signed a second form sheet entitled "Consent to Interview and Lie Detector Examination/Bureau of Criminal Identification and Investigation." That form stated as follows:

{¶ 19} "[I] have been advised that I have the right to refuse to submit to a lie detector examination. I have been advised of my right to consult with an attorney, and have been told that any comments I make in connection with the examination may be used against me in a court of law. I wish to state that I am taking this examination of my own free will and that no force, duress, or undue influence was exercised by anyone. Neither was I given any promise of any reward or consideration of any kind to induce me to submit to this examination * * *."

{¶ 20} Further, according to the testimony of Cindy Erwin, who conducted the polygraph examination and interview, King was orally informed that he could discontinue the procedure at any time.

{¶ 21} From our review of the record, we conclude that King's rights under the Fifth Amendment were not violated. In addition, there is no indication in the record that King failed to knowingly and voluntarily waive his *Miranda* rights or that his statements were made involuntarily.

{¶ 22} The first assignment of error is overruled.

### III

{¶ 23} King's second assignment of error states:

{¶ 24} "The verdict against Mr. King was not supported by the sufficiency of the evidence."

{¶ 25} King contends that the state failed to present evidence sufficient to prove the elements of the charges against him.

{¶ 26} A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in

a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶ 27} King was convicted of felonious assault in violation of R.C. 2903.11, which states:

{¶ 28} "(A) No person shall knowingly do either of the following:

{¶ 29} "(1) Cause serious physical harm to another * * * ."

{¶ 30} R.C. 2901.22(B) defines knowingly: "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

{¶ 31} King was also convicted of one count of child endangering in violation of R.C. 2919.22(A) and one count of child endangering in violation of R.C. 2919.22(B)(1). Those statutes provide:

{¶ 32} "(A) No person, * * * in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. * * *

{¶ 33} "(B) No person shall do any of the following to a child under eighteen years of age * * *:

{¶ 34} "(1) Abuse the child."

{¶ 35} Both of these provisions, as charged, require a finding of serious physical harm. R.C. 2919.22(E)(2)(c) and (d).

{¶ 36} "Serious physical harm" means "any physical harm that carries a substantial risk of death," or "any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity." R.C. 2901.01(A)(5)(b) and (c).

{¶ 37} King contends that the state failed to prove its case because it failed to present any eyewitness to testify that he was the one who caused harm to Destiny. He further contends that the state failed to prove that he knowingly harmed Destiny. King contends that the evidence supports a finding that Destiny's injury was accidental and that a possible fall from her toddler bed following a seizure was the cause of the trauma. He further argues that the state failed to prove that Destiny was not injured earlier during the day while visiting her grandparents.

{¶ 38} The evidence in this case shows that Destiny had no history of health problems, despite King's assertion that she had a history of breathing difficulty.

It also shows that on September 1, 2006, Destiny spent the day with her grandparents until she was picked up by Randi Shepherd and King. At that time, Destiny was acting normally. Shepherd, King, and Destiny then returned to their residence.

{¶ 39} At some point in the evening, Shepherd left the residence to go to a store "up the street" to purchase some milk. Shepherd left Destiny in the exclusive care of King; Destiny was behaving normally at that point. There is evidence in the record that Destiny tended to become fussy when out of Randi's presence. Further, King's own evidence demonstrated that he tended to anger easily and that he had a problem controlling his anger.

{¶ 40} While Shepherd was gone, King placed a telephone call to 9–1–1, during which he told the operator that Destiny was having difficulty breathing. Upon the arrival of the EMTs, Destiny was discovered to be limp and nonresponsive.

{¶ 41} The medical evidence supports a finding that Destiny suffered a traumatic injury to her head. Destiny had swelling of her entire brain with a small area of bleeding and a skull fracture. She also had bruises around her neck. Dr. Henry, the pediatric emergency physician who treated Destiny, testified that the injury sustained by Destiny was consistent with "shaken impact syndrome," which means that the child was shaken hard enough to break veins "that bridge from the skull into the brain" and that the child's head was hit against a hard surface. Henry testified that the child would not have been capable of standing or playing once the trauma was incurred, thereby dispelling the idea that Destiny's injury occurred earlier in the day. The pediatrician also testified that Destiny's injuries were not consistent with a short-distance fall from a toddler bed.[2]

{¶ 42} Destiny's primary-care doctor, Jim Duffee, M.D., testified that prior to the injury, Destiny was developmentally normal and healthy. He further testified that the injury sustained by Destiny would cause immediate disability and that the injuries were consistent with "inflicted trauma." He testified that the damage to Destiny's eyes was consistent with child abuse in the form of "shaken baby syndrome." He also corroborated the testimony of Dr. Henry regarding the fact that the injuries were not caused by a short fall but rather by shaking the child and causing her to hit her head with "significant force."

{¶ 43} Finally, the medical evidence indicates that Destiny's injuries were so severe that Dr. Henry testified that the injuries were life threatening and that she believed that Destiny would "potentially die." It also demonstrates that

---

2. We note that the evidence shows that Destiny's toddler bed is only about one foot off the ground and that it has guard rails to prevent the toddler from rolling out of the bed.

Destiny suffered permanent injury in the form of severe developmental delay, cortical blindness, and intractable epilepsy.

{¶ 44} Thus, the state presented sufficient evidence to support a finding that Destiny suffered serious physical harm. We further conclude that despite the fact that there was no eyewitness to the actual injury, the evidence supports a finding that the harm was not caused by an accidental fall following a seizure, or by an injury earlier in the day. To the contrary, the evidence supports a finding that the injury occurred during the time that King had exclusive care and control of Destiny. The evidence also supports a reasonable inference that King caused the injury by shaking the child and causing her skull to impact on a hard surface. We finally conclude that the evidence supports a reasonable inference that King, by shaking the child with such force and hitting her head on a surface, should have been aware that his conduct would cause harm to the child.

{¶ 45} We conclude that the state presented evidence sufficient to satisfy the elements of the charged offenses. The second assignment of error is overruled.

IV

{¶ 46} King's third assignment of error provides:

{¶ 47} "Mr. King was denied the effective assistance of counsel."

{¶ 48} King contends that trial counsel failed to provide effective assistance. Specifically, he contends that counsel was ineffective because he failed to (1) call an expert witness, (2) present any witnesses regarding the fact that Destiny's family had a medical history of seizures, and (3) "vigorously object" to leading questions posed by the prosecutor. King also claims that trial counsel was not able to adequately represent him because counsel was worried that King would harm him. Finally, King contends that counsel confused the trial judge regarding his claimed defense of accident.

{¶ 49} In order to demonstrate ineffective assistance of counsel, King must establish that his counsel's representation fell below an objective standard of reasonableness and that he has been prejudiced by his counsel's deficient performance. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Bradley*, 42 Ohio St.3d at 142, 538 N.E.2d 373. Furthermore, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. See *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Hindsight is not permitted to distort the assessment of what was

reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. Id.; *State v. Parker*, Montgomery App. No. 19486, 2003-Ohio-4326, 2003 WL 21949748, ¶ 13.

{¶ 50} We begin with the claim that counsel was ineffective because he failed to present an expert witness. The record demonstrates that counsel filed a motion for the appointment of an expert witness and that he had consulted an expert to discuss the facts and the medical records. During the hearing on the suppression motion, defense counsel indicated that he believed that King could reasonably present the defense of accident. He also stated that an accident defense would be bolstered by testimony from the expert he had consulted. However, counsel also stated that King refused to present the defense of accident, maintaining that he did not harm the child. Thus, counsel subsequently determined that expert testimony would not be helpful, given that King persisted in his claim that he done nothing to cause harm to the child. Based upon these facts, we cannot say that counsel was deficient by not presenting expert testimony.

{¶ 51} We next turn to the claim that counsel was deficient for failing to present any evidence of the fact that Destiny's family had a medical history of seizures. During defense counsel's cross-examination of Randi Shepherd, he asked whether she was aware that Destiny's father had "some history of seizures" on the paternal side of his family. Randi acknowledged that she was aware of this history. King contends that counsel should have presented a witness regarding this claim. We disagree.

{¶ 52} First, counsel was able to present to the jury the fact that Destiny had a family history of seizures simply by eliciting Randi Shepherd's admission of that fact. Thus, we fail to see how counsel was deficient. Furthermore, there is no evidence in this record to indicate whether there was any prospective witness with knowledge of this fact. Additionally, there is no evidence that Destiny had ever suffered from seizures. Second, given that the medical testimony ruled out the possibility that Destiny's injury was the result of seizure activity, or that the injury was sustained as a result of the child falling out of her toddler bed following a seizure, we cannot conclude that additional testimony concerning a family history of seizures would have changed the outcome of this case.

{¶ 53} Next, we address the claim that defense counsel failed to object to leading questions asked by the prosecutor during the redirect examination of Dr. Henry. We have reviewed the portion of the transcript to which King cites, and we do not conclude that the prosecutor was asking objectionable questions.

{¶ 54} King also contends that defense counsel was prevented from adequately concentrating on the trial due to the fact that he was concerned that

King intended to cause counsel harm. The record reveals that during the course of the trial, King threatened the prosecutor, stated that he was dissatisfied with his counsel, shouted during the proceedings, and accused the trial court of being unfair. At one point during a break, King was being escorted from the courtroom by sheriff's deputy Wayne Dillahunt when he "became very agitated" and proceeded to punch a water fountain outside the courtroom. The prosecutor then stated on the record that the fountain had been dented, and that he wanted to present Deputy Dillahunt as a witness in an attempt to demonstrate King's tendency to anger easily. After that, defense counsel informed the trial court that he was concerned about his own safety due to King's behavior. However, counsel did not elaborate on his concerns; instead, he immediately began to argue against the prosecutor's attempt to include Deputy Dillahunt as a witness.

{¶ 55} Other than counsel's statement, King cites no other support for his claim that counsel's unease prevented him from properly trying the case. Our review of the transcript does not support this assertion. Finally, under the doctrine of invited error, a litigant ordinarily may not bring about reversible error in the record by his own action, such as by acting in a manner likely to place his trial counsel in fear of bodily harm. Thus, we find this claim is without merit.

{¶ 56} Finally, we address the claim that counsel somehow confused the trial judge regarding King's defense. King cites one page of the transcript on which the trial judge noted that he had been unclear as to the nature of King's defense. However, the trial judge went on to state that after reviewing his notes, any misunderstanding had been clarified.

{¶ 57} A review of this record demonstrates that trial counsel was diligent in pursuing a defense for King. The record indicates that counsel required the state to produce all of Destiny's medical records, including records the state had not reviewed. Furthermore, the record shows that counsel filed relevant motions and disclosures and that he diligently represented King at the suppression hearing and at trial.

{¶ 58} We find that the claim of ineffective assistance of counsel is not supported by this record. Accordingly, the third assignment of error is over-ruled.

V

{¶ 59} All of King's assignments of error having been overruled, the judgment of the trial court is affirmed.

Judgment affirmed.

WOLFF, P.J., and BROGAN, J., concur.